ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2020-Jul-15  16:42:13
23CV-20-771
C20D01 : 43 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
### TWENTIETH JUDICIAL DISTRICT
_____ DIVISION

DANIELLE MARSHALL, on behalf of
herself and all others similarly situated,

*Plaintiff,*

v.

CONWAY REGIONAL MEDICAL
CENTER, INC., d/b/a Conway
REGIONAL HEALTH SYSTEM,

*Defendant.*

**JURY DEMAND**

Case No. _____

## CLASS ACTION COMPLAINT

Plaintiff, Danielle Marshall ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Conway Regional Medical Center, Inc., d/b/a Conway Regional Health System, and alleges as follows:

## NATURE OF THE ACTION

1.    This is a civil action seeking monetary damages and injunctive and declaratory relief from Conway Regional Medical Center, Inc. d/b/a Conway Regional Health System ("Conway"), arising from its failure to safeguard certain Personally

Identifying Information[1] and Protected Health Information[2] (collectively, "PII") of thousands of its current and former patients. Consequently, those patients' PII—including their "names, addresses, Social Security numbers, health insurance information and limited medical information"—has been compromised.[3]

2.      Sometime prior to June 26, 2019, cybercriminals gained access to certain email accounts of Conway's employees, thereby gaining access to information technology systems which contained confidential and sensitive PII for 37,000[4] current and former patients of Conway (the "Data Breach").

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiff do not assert any claim pursuant to federal law herein.

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), protected health information is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia,* a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity.* Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule,* DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited July 14, 2020). Conway is clearly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information", subject to HIPAA.

[3] *Security Notification,* CONWAY REGIONAL HEALTH SYSTEM, https://www.conwayregional.org/opportunities/2-uncategorised/270-data-security-incident (last visited July 14, 2020). Plaintiff also received a notification letter from Conway, which is annexed hereto as her *Exhibit A.*

3.      As will be more fully explained below, Plaintiff and members of the Class have been significantly injured by the Data Breach. Plaintiff and the Class also now forever face an amplified risk of fraud and identity theft due to their sensitive PII falling into the hands of cybercriminals.

4.      On behalf of herself and the Class preliminarily defined below, Plaintiff brings causes of action sounding in negligence, *per se* negligence, invasion of privacy, breach of contract, including breach of the covenant of good faith and fair dealing, trespass to chattels, bailment, violations of The Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101, *et seq.*, unjust enrichment, and conversion. Plaintiff seeks damages and injunctive and declaratory relief arising from Conway's failure to adequately protect her highly sensitive PII.

## PARTIES

5.      Plaintiff Danielle Marshall is a natural person who resides in Arkansas. Plaintiff is a former patient at Conway and her PII was stored on Conway's system at all times material hereto.

6.      Defendant Conway Regional Medical Center, Inc. is an Arkansas Nonprofit Corporation, with its principal place of business located at 2302 College Avenue, Conway, Arkansas 72034.

7.      One of the fictitious names Conway operates under is Conway Regional Health System.

---

[4] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information,* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE FOR CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited July 14, 2020).

8.      Conway provides medical services throughout Arkansas, with primary care clinics, emergency rooms, and specialty clinics in Faulkner, Pope, Van Buren and Yell Counties.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to Amendment 80 § 6(A) of the Arkansas Constitution and Ark. Code Ann. § 16-13-201(a), because the amount in controversy herein exceeds this Court's jurisdictional threshold.

10.     This Court has general personal jurisdiction over Conway because Conway is domiciled in Arkansas.

11.     Preferred venue lies in Faulkner County under Ark. Code Ann. §§ 16-60-101(a)(1), (2)(B), because Conway maintains its principal office in Faulkner County, and upon information and belief, Faulkner County is the county where a substantial part of the events or omissions giving rise to the causes of action herein occurred.

## FACTUAL ALLEGATIONS

**A.      Plaintiff and the Class Members entrusted their PII to Conway.**

12.     Plaintiff and the members of the Class are present and former patients of Conway.

13.     As a condition for receiving treatment, Plaintiff and Class Members were required by Conway to confide and make available to it, its agents, and its employees, sensitive and confidential PII, including, but not limited to, their names,

addresses, Social Security numbers, Medicare ID numbers, health insurance information and limited medical information.

14.    Conway acquired, collected, and stored a massive amount of PII of its patients.

15.    By obtaining, collecting, using, and deriving a benefit from its patients' PII, Conway assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their PII from unauthorized disclosure.

16.    Plaintiff has taken reasonable steps to maintain the confidentiality of her PII. Plaintiff, as a former patient, relied on Conway to keep her PII confidential and securely maintained, to use that information for business purposes only, and to make only authorized disclosures of that information.

17.    Indeed, Conway maintains a policy which specifically acknowledges its legal obligation to maintain the privacy of patient PII entrusted to it and to only disclose such information under limited circumstances, none of which were present here.

18.    Conway's policy is outlined in its Notice of Privacy Practices (Conway's "Privacy Policy"), which became effective on September 9, 2013. Conway's Privacy Policy is attached hereto as Plaintiff's *Exhibit B*.

19.    In its Privacy Policy, Conway represents that it is "committed to protecting the confidentiality of [patients'] medical information." Ex. B at 2. Conway's Privacy Policy goes on to circumscribe the way patients' PII can and cannot be

disclosed to, *inter alia*, third parties. *Id.* at 1-2. The Privacy Policy represents that "The law requires that [Conway] have privacy protections for [Protected Health Information ("PHI")] and to give [patients] Notice of [its] legal responsibilities to individuals." *Id.* at 1. The Data Breach that is the subject of this civil action is not contemplated or permitted by Conway's Privacy Policy. *Id.*

20.    Plaintiff entrusted her PII to Conway solely for the purpose of effectuating treatment and the payment therefor with the expectation and implied mutual understanding that Conway would strictly maintain the confidentiality of that information and safeguard it from theft or misuse.

21.    Plaintiff would not have entrusted Conway with her highly sensitive PII if she had known that Conway would not maintain it securely and protect it from unauthorized use or disclosure.

**B.    The security of patients' PII was compromised in the Data Breach.**

22.    Plaintiff was a former patient of Conway.

23.    When Plaintiff presented to Conway for treatment, its agents provided her with various disclosure statements regarding Conway's Privacy Policy and its obligations under HIPAA to safeguard patients' PII—as Conway was required to do by law.[5] *See* Ex. B.

24.    As a prerequisite to receiving treatment, Plaintiff divulged her personal and sensitive PII to Conway, with the implicit understanding that her PII would be kept confidential. This understanding was based on all the facts and circumstances

---

[5] *See, e.g.*, 45 C.F.R. § 164.520(c)(2)(iii)(B).

attendant to her receiving care, and the express, specific, written representations made by Conway and its agents.

25.    Plaintiff reasonably relied upon Conway's representations to her detriment and would not have provided her sensitive PII to Conway but for Conway's explicit and implicit promises to adequately safeguard that information.

26.    On or about August 23, 2019, Conway sent letters to Plaintiff and all Class Members notifying them that their PII had been compromised during the Data Breach. Plaintiff received one such letter.[6]

27.    According to Conway, sometime prior to June 26, 2019, "some employees' email accounts had been accessed by an unknown, unauthorized third party as the result of an email phishing attack."[7]

28.    According to Conway, "an unknown, unauthorized third party could have viewed or accessed documents in the accounts that contained patients' names, addresses, Social Security numbers, health insurance information and limited medical information."[8]

29.    While the notification letter does not state when the cybercriminals' access to Conway's information technology systems began, the notification does state that Conway did not detect the unauthorized access until June 26, 2019.[9] It is not

---

[6] *Security Notification, supra* note 3.

[7] *Ibid.*

[8] *Ibid.*

[9] *Ibid.*

clear how long cybercriminals had unfettered access to Conway's information technology systems.

30.    As a result of this Data Breach, the PII of 37,000 Conway patients was compromised.

31.    The Data Breach was preventable and a direct result of Conway's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' PII.

32.    Further, Conway allegedly discovered the breach on June 26, 2019 yet neglected to inform Plaintiff and the Class until nearly two months later, on or about August 23, 2019.

## C.    Healthcare providers like Conway are a prime target for Cybercriminals.

33.    Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[10] The next year, that number increased by nearly 50%.[11] The following year, the healthcare sector was the second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.[12]

---

[10] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, IDENTITY THEFT RESOURCE CENTER ("ITRC") (Jan. 19, 2017), https://www.idtheftcenter.org/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout/.

[11] *2017 Annual Data Breach Year-End Review*, ITRC, (Jan. 25, 2018), https://www.idtheftcenter.org/images/breach/2017Breaches/2017AnnualDataBreachYearEndReview.pdf.

[12] *2018 End-of-Year Data Breach Report*, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

34.     Hospital data breaches have continued to rapidly increase. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 82 percent of participating hospitals reported having a significant security incident within the last twelve months, with a majority of those being caused by "bad actors."[13]

35.     "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[14]

36.     The PII stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach—Social Security number, name, treatment history, etc.— is difficult, if not impossible, to change.

37.     This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained,

---

[13] *2019 HIMSS Cybersecurity Survey*, HEALTHCARE INFORMATION AND MANAGEMENT SYSTEMS SOCIETY, INC. (Feb. 8, 2019), https://www.himss.org/sites/hde/files/d7/u132196/ 2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf.

[14] Benishti, Eyal, *How to Safeguard Hospital Data from Email Spoofing Attacks*, INSIDE DIGITAL HEALTH, (Apr. 4, 2019), https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

"Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[15] Likewise, the FBI has warned healthcare organizations that PII data is worth 10 times as much as personal credit card data on the black market.[16]

38.    PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers.

39.    The value of Plaintiff's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

40.    As storehouses of that lucrative information, hospitals are also highly targeted by cybercriminals because, "primarily due to budget and resources, hospital

---

[15] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[16] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, Conway can and should perform (or hire a third-party expert to perform).

security systems are often less sophisticated and decentralized than those in other industries, such as financial services," making them an easier target.[17]

41.    Cybercriminals regularly target hospitals with email phishing schemes, which "remain[] the primary attack vector for nine out of 10 cyberattacks."[18] The Data Breach in this action occurred as a result of one such phishing attack.[19]

42.    Companies can mount two primary defenses to phishing scams: employee education and technical security barriers.

43.    Employee education is the process of adequately making employees aware of common phishing attacks and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients. Employee education and secure file-transfer protocols provide the easiest method to assist employees in properly identifying fraudulent e-mails and preventing unauthorized access to PII.

44.    From a technical perspective, companies can also greatly reduce the flow of phishing e-mails by implementing certain security measures governing e-mail transmissions. Companies can use a simple e-mail validation system that allows domain owners to publish a list of IP addresses that are authorized to send emails on their behalf to reduce the amount of spam and fraud by making it much harder for

---

[17] Benishti, *supra* note 14.

[18] *Ibid.*

[19] *See Security Notification, supra* note 3.

malicious senders to disguise their identities. Companies can also use email authentication that blocks email streams that have not been properly authenticated.

**D.    Conway failed to sufficiently protect the PII that patients had entrusted to it.**

1. Conway failed to adhere to HIPAA.

45.    HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[20]

46.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII is properly maintained.[21]

47.    Conway's Data Breach resulted from a combination of inadequacies showing it failed to comply with safeguards mandated by HIPAA. Conway's security failures include, but are not limited to:

---

[20] HIPAA lists eighteen types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, social security numbers, and medical record numbers.

[21] *See* 45 C.F.R. § 164.306 (Security standards and General rules); 45 C.F.R. § 164.308 (Administrative safeguards); 45 C.F.R. § 164.310 (Physical safeguards); 45 C.F.R. § 164.312 (Technical safeguards).

a.     Failing to ensure the confidentiality and integrity of electronic PII that it creates, receives, maintains, and transmits, in violation of 45 C.F.R. § 164.306(a)(1);

b.     Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PII, in violation of 45 C.F.R. § 164.306(a)(2);

c.     Failing to protect against any reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

d.     Failing to ensure compliance with HIPAA security standards by Conway's workforce, in violation of 45 C.F.R. § 164.306(a)(4);

e.     Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

f.     Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1);

g.     Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable,

harmful effects of security incidents that are known to the covered entity, in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.     Failing to effectively train all staff members on the policies and procedures with respect to PII as necessary and appropriate for staff members to carry out their functions and to maintain security of PII, in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.     Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PII, in compliance with 45 C.F.R. § 164.530(c).

2.    <u>Conway failed to adhere to FTC guidelines.</u>

48.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[22] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Conway, should employ to protect against the unlawful exposure of PII.

49.    In 2016, the FTC updated its publication *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental

---

[22] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

data security principles and practices for business.[23] The guidelines explain that businesses should:

a.    protect the personal customer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

d.    understand their network's vulnerabilities; and

e.    implement policies to correct security problems.

The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

50.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[24]

51.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the

---

[23] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Sep. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[24] *See Start with Security, supra* note 22.

Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

52.     Conway's failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

3.     <u>Conway failed to adhere to industry standards.</u>

53.     As stated above, the healthcare industry continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[25] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[26] As a result, both the government and private sector have developed industry best standards to address this growing problem.

54.     The United States Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that, "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large

---

[25] 2018 End of Year Data Brach Report, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year Aftermath_FINAL_V2_combinedWEB.pdf.

[26] *Id.*

quantities of highly sensitive and valuable data."[27] DHHS highlights "several basic cybersecurity safeguards that can be implemented to improve cyber resilience which only require a relatively small financial investment, yet they can have a major impact on an organization's cybersecurity posture."[28] Most notably, organizations must properly encrypt PII in order to mitigate against misuse.

55.    The private sector has similarly identified the healthcare sector as particularly vulnerable to cyberattacks both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.[29]

56.    Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Conway failed to adopt sufficient data security processes, a fact highlighted in its notification to affected patients in which it revealed that only after the Data Breach, Conway has "taken steps to prevent a similar event from occurring in the future."[30]

57.    Conway failed to adequately train its employees on even the most basic of cybersecurity protocols, including:

---

[27] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

[28] *Id.*

[29] *10 Cyber Security Best Practices For the Healthcare Industry*, NTIVA (Jun. 19, 2018), https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry.
[30] *Security Notification, supra* note 3.

a. How to detect phishing emails and other scams including providing employees examples of these scams and guidance on how to verify if emails are legitimate;

b. Effective password management and encryption protocols for internal and external emails;

c. Avoidance of responding to emails that are suspicious or from unknown sources;

d. Locking, encrypting, and limiting access to computers and files containing sensitive information; and

e. Implementing guidelines for maintaining and communicating sensitive data.

58. Conway's failure to implement these rudimentary measures made it an easy target for the Data Breach that came to pass.

**E.     Plaintiff and the Class Members were significantly harmed by the Data Breach.**

59. As discussed above, PII is among the most sensitive, and personally damaging information. A report focusing on breaches in the healthcare industry found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000.00" per person, and that the victims were further routinely forced to pay out-of-pocket costs for health care they did not receive in order to restore coverage.[31]

---

[31] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

60.    Victims of medical identity theft can suffer significant financial consequences. "In some cases, they [must pay] the healthcare provider, repa[y] the insurer for services obtained by the thief, or . . . engage[] an identity service provider or legal counsel to help resolve the incident and prevent future fraud."[32]

61.    Moreover, nearly half of identity theft victims lost their health care coverage as a result of a data breach incident, nearly one-third reported that their premiums went up, and forty percent never resolved their identity theft at all.[33]

62.    "Unfortunately, by the time medical identity theft is discovered, the damage has been done. Forty percent of consumers say that they found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that thieves incurred in their name. As a result, the consequences of medical identity theft are frequently severe, stressful and expensive to resolve."[34]

63.    Moreover, resolution of medical identity theft is time consuming to remedy. "Due to HIPAA privacy regulations, victims of medical identity theft must be involved in the resolution of the crime. In many cases, victims struggle to reach resolution following a medical identity theft incident."[35] Consequently, they remain

---

[32] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE LLC 1 (Nov. 18, 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.

[33] *Id.*

[34] *The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches*, EXPERIAN (Apr. 13, 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[35] *Id.*

at "risk for further theft or errors in [their] healthcare records that could jeopardize medical treatments and diagnosis."[36]

64.    These consequences are further exacerbated when, like here, the PII compromised includes Social Security numbers, which make it possible for cybercriminals to perpetrate the most serious types of fraud such as filing tax returns, seeking unemployment benefits, or even applying for a job using a false identity. Each of these fraudulent activities is difficult to detect and may not be uncovered until the number has already been used in a fraudulent transaction. Moreover, it is no easy task to cancel a stolen Social Security number, and even then "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[37]

65.    The Social Security Administration has warned that identity thieves can use stolen Social Security numbers to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years, later.[38]

66.    As a result of the Data Breach, Plaintiff and Class Members now face, and will continue to face, a heightened risk of identity theft and fraud for the rest of their lives.

---

[36] *Id.*

[37] Naylor, B., *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[38] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMIN. (June 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf.

67.    As a long-standing member of the healthcare community, Conway knew or should have known the importance of safeguarding patient PII entrusted to it and of the foreseeable consequences of a breach. Despite this knowledge, however, Conway failed to take adequate cyber-security measures to prevent the most commonplace kind of breach—email phishing—from happening.

68.    Conway has not provided any compensation to patients victimized in the Data Breach. Conway merely offered twelve months of Equifax Credit Watch Gold, which only monitors her credit report with one of the three Credit Bureaus – as the name implies, Equifax—in addition to internet scanning of unspecified "suspicious web sites . . . ."

69.    Even if Conway did reimburse Plaintiff for the harm she suffered, it is incorrect to assume that reimbursing a victim of the Data Breach for financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[39]

70.    As a result of Conway's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer significant damages. They have suffered or are at increased risk of suffering:

---

[39] *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUSTICE 10, 11 (Jan. 27, 2014), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

a.   The loss of the opportunity to control how their PII is used;

b.   The diminution in value of their PII;

c.   The compromise, publication, and/or theft of their PII;

d.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud, including the purchase of identity theft protection insurance and detection services;

e.   Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.   Delay in receipt of tax refund monies;

g.   Unauthorized use of stolen PII;

h.   The continued risk to their PII, which remains in the possession of Conway and is subject to further breaches so long as Conway fails to undertake appropriate measures to protect the PII in their possession; and

i.   Current and future costs related to the time, effort, and money that will be expended to prevent, detect, contest, remediate, and

repair the impact of the Data Breach for the remainder of the lives

of Plaintiff and Class Members.

71.     Plaintiff has already incurred harm as a result of the Data Breach.

72.     For example, in an effort to mitigate the heightened risk of identity theft

and fraud that she now faces, Plaintiff has subscribed to an online credit monitoring

service that provides online credit scores to consumers direct from the credit bureaus.

While this credit monitoring service allows Plaintiff to monitor her credit report to

determine whether suspicious activity has occurred, it is powerless to stop identity

theft in advance and does not indemnify her from, or insure her against, the harm

caused by the Data Breach.

73.     Moreover, Plaintiff has been the victim of serial fraudulent activity since

the Data Breach happened, including, but not limited to:

a.     Plaintiff's email address was exposed on the dark web on or about
September 30, 2019;

b.     On or about May 9, 2020, an unknown actor attempted to login
into Plaintiff's Spotify account; and

c.     Plaintiff has been the recipient of a substantial increase in spam
telephone calls, emails, and flyers in the mail that reflect
knowledge of Plaintiff's medical history that is not generally
known to the public since the date of the Data Breach.

74.     Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm she has suffered on account of the Data Breach.

75.     To her knowledge, Plaintiff has not been the victim of any other data breach.

## CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action pursuant to Arkansas Rule of Civil Procedure ("ARCP") 23 on behalf of herself and as a class action on behalf of the following proposed class ("the Class"):

> All persons residing in the State of Arkansas whose PII was compromised in Conway's Data Breach.

77.     Excluded from the Class are the officers, directors, and legal representatives of Conway and the judges and court personnel in this case and any members of their immediate families. Plaintiff reserves the right to modify or amend the class definition upon receiving meaningful discovery.

78.     This action is properly maintainable as a class action under ARCP 23(a) and (b).

79.     **ARCP 23(a)(1) Numerosity:** The members of the Class are so numerous that joinder of all members is impractical. While the number of Class Members is unknown to Plaintiff at this time, based on information and belief, it is estimated to include thousands of individuals. Conway reported that 37,000 former patients were victims of the Data Breach. The exact number is generally

ascertainable by appropriate discovery as Conway has knowledge of which victims are residents of Arkansas.

80.   **ARCP 23(a)(2) Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.    Whether and to what extent Conway had a duty to protect the PII of Plaintiff and the Class;

      b.    Whether Conway failed to adopt the practices and procedures necessary to adequately safeguard the information compromised in the Data Disclosure;

      c.    Whether Conway adequately and accurately informed Class Members that their PII had been compromised;

      d.    Whether Class Members are entitled to actual damages, statutory damages, and/or punitive damages as a result of Conway's wrongful conduct; and

      e.    Whether Plaintiff and the Class are entitled to restitution as a result of Conway's wrongful conduct.

81.   **ARCP 23(a)(3) Typicality:** Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised by the Data Breach. Further, Plaintiff, like all Class Members, was injured by Conway's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no

defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class Members arise from the same operative facts and are based on the same legal theories.

82.     **ARCP 23(a)(4) Adequacy of Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class in that she has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiff suffered are typical of other Class Members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.

83.     **ARCP 23(b) Predominance:** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the questions identified in Paragraph 80 above.

84.     **ARCP 23(b) Superiority of Class Action:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class Members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that

are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

85.    The litigation of the claims brought herein is manageable. Conway's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

86.    Adequate notice can be given to Class Members directly using information maintained in Conway's records.

87.    It does not appear that other persons who fall within the Class definition set forth above are pursuing individual litigation.

88.    This proposed class action does not present any unique management difficulties.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE and/or NEGLIGENCE *Per Se*

89.    Plaintiff repeats and incorporates by reference the preceding paragraphs.

90.    As a condition of receiving services, Plaintiff and Class Members were obligated to provide Conway their PII.

91.    Plaintiff and the Class Members entrusted their PII to Conway with the understanding that Conway would safeguard it.

92.     Conway had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

93.     Conway had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, *inter alia*, designing, maintaining and testing Conway's security protocols to ensure that Plaintiff's and Class Members' PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cyber security measures regarding patient PII.

94.     Plaintiff and the Class Members were the foreseeable and probable victims of any inadequate security practices and procedures that Conway employed. Conway knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, that it had inadequately trained its employees, and that its security protocols were insufficient to secure the PII of Plaintiff and Class Members.

95.     Conway's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Conway's misconduct included, but was not limited to, its failure to take the steps to prevent the Data Breach as set forth herein. Conway's misconduct also included its decision to not comply with industry standards for the safekeeping and authorized disclosure of patient PII.

96.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Conway, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Conway's duty in this regard.

97.     Conway further violated Section 5 of the FTC Act by failing to use reasonable measures to protect patient PII and not complying with applicable industry standards, as described herein. Conway's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiff and Class Members.

98.     Plaintiff and the Class Members had no ability to protect their PII once they entrusted it to Conway.

99.     Conway has admitted that Plaintiff's and the Class Members' PII was wrongfully disclosed to cybercriminals as a result of the Data Breach.

100.    Conway breached its duty to Plaintiff and the Class by failing to exercise ordinary and reasonable care in protecting and safeguarding their PII while it was within Conway's possession or control.

101.    Conway unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent unauthorized dissemination of its patients' PII.

102.    Conway also unlawfully breached its duty to adequately disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

103.    But for Conway's wrongful and negligent breach of duties owed to Plaintiff and Class Members, Plaintiff's and Class Members' PII would not have been compromised.

104.    As a result of Conway's negligence, Plaintiff and the Class have suffered and will continue to suffer damages and injury including, but not limited to, out-of-pocket expenses associated with mitigating against the heightened risk of identity theft and fraud caused by the Data Breach; the time and costs associated with remedying identity theft and fraud fairly attributable to the Data Breach; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

105.    These harms are directly and proximately caused by the Data Breach.

106.    Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

## SECOND CLAIM FOR RELIEF
### INVASION OF PRIVACY

107.    Plaintiff repeats and incorporates by reference the preceding paragraphs.

108.    Plaintiff and Class Members took reasonable and appropriate steps to keep their PII confidential from the public.

109.    Plaintiff's and Class Members' efforts to safeguard their own PII were successful, as their PII was not known to the general public prior to the Data Breach.

110.   Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

111.   Conway owed a duty to its patients, including Plaintiff and Class Members, to keep their PII confidential.

112.   The unauthorized release of PII, especially PHI, is highly offensive to a reasonable person.

113.   Plaintiff's and Class Members' PII is not of legitimate concern to the public.

114.   Conway knew or should have known that Plaintiff's and Class Members' PII was private, as Conway is a "covered entity" subject to HIPAA.

115.   Conway publicized Plaintiff's and Class Members' PII by communicating it to cyber criminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web.

116.   Indeed, not only is Plaintiff's and Class Members' PII traveling the dark web, but it is being used to commit fraud; it is being disseminated amongst, *inter alia*, merchants, creditors, health care providers, and governmental agencies.

117.   It is therefore substantially certain that the Plaintiff's and the Class Members' PII is rapidly becoming public knowledge—among the community writ large—due to the nature of the phishing campaign that procured it, and the identity theft that it is designed for.

118.   Unless and until enjoined, and restrained by order of this Court, Conway's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Conway's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class Members' privacy by Conway.

119.   Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

**THIRD CLAIM FOR RELIEF**
**BREACH OF CONTRACT INCLUDING THE COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

120.   Plaintiff repeats and incorporates by reference the preceding paragraphs.

121.   Conway offered to provide medical treatment services to Plaintiff and Class Members in exchange for payment.

122.   Plaintiff and the Class accepted Conway's offer to provide medical treatment services by paying for them and receiving said treatment.

123.   Conway required Plaintiff and Class Members to provide their PII, including names, addresses, Social Security numbers, health insurance information, and limited medical information, in order to receive care from Conway.

124.   Plaintiff and Class Members exchanged valuable consideration—money—with Conway for services, a crucial part of which was Conway's promise to protect their PII from unauthorized disclosure.

-32-

125.   In its Privacy Policy, Conway expressly promised Plaintiff and the Class that it would only disclose PII under certain circumstances, none of which relate to the Data Breach. *See* Ex. A.

126.   Necessarily implicit in the agreement between Conway and its patients, including Plaintiff and Class Members, was Conway's obligation to use such PII for business and treatment purposes only, to take reasonable steps to secure and safeguard that PII, and not make disclosures of the PII to unauthorized third parties.

127.   Further implicit in the agreement, Conway was obligated to provide Plaintiff and the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

128.   Plaintiff and the Class would not have entrusted their PII to Conway in the absence of such agreement with Conway.

129.   Conway materially breached the implied contract(s) they had entered with Plaintiff and Class Members by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Conway further breached the implied contracts with Plaintiff and Class Members by:

> a.   Failing to properly safeguard and protect Plaintiff's and Class Members' PII;
>
> b.   Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

      c.      Failing to ensure the confidentiality and integrity of electronic PII that Conway created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

130. The damages sustained by Plaintiff and Class Members as described above were the direct and proximate result of Conway's material breaches of its agreements.

131. Plaintiff and Class Members have performed as required under the relevant agreements, or such performance was waived by the conduct of Conway.

132. Under the laws of Arkansas, good faith is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

133. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

134. Conway failed to promptly advise Plaintiff and the Class of the Data Breach.

135.   In these and other ways, Conway violated its duty of good faith and fair dealing.

136.   Plaintiff and members of the Class have sustained damages as a result of Conway's breaches of the Contract, including breaches of the Contract through violations of the covenant of good faith and fair dealing.

137.   Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

### FOURTH CLAIM FOR RELIEF
### TRESPASS TO CHATTELS

138.   Plaintiff repeats and incorporates by reference the preceding paragraphs.

139.   Plaintiff and the Class entrusted their PII to Conway with the understanding that it would keep that information confidential.

140.   Conway intentionally dispossessed the Plaintiff and the putative members of the Class of their PII and/or used or intermeddled with the Plaintiff and the putative members of the Class's possession of their PII when it allowed cybercriminals to access it, going far beyond the bounds of any consent Plaintiff and the Class bestowed upon Conway.

141.   As explained at length above, Plaintiff and the Class Members were damaged thereby.

142.   Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

## FIFTH CLAIM FOR RELIEF
### BAILMENT

143.    Plaintiff repeats and incorporates by reference the preceding paragraphs.

144.    Plaintiff, the Class, and Conway contemplated a mutual benefit bailment when the Plaintiff and putative members of the Class transmitted their PII to Conway solely for treatment and the payment thereof.

145.    Plaintiff's and the Class's PII was transmitted to Conway in trust for a specific purpose (treatment), with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

146.    Conway was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiff's and the Class's PII.

147.    Plaintiff's and the Class's PII was used for a different purpose than the Plaintiff and the Class intended, for a longer time period and/or in a different manner or place than the parties intended.

148.    As explained at length above, Plaintiff and the Class were damaged thereby.

149.    Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

## SIXTH CLAIM FOR RELIEF
### The Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101, *et seq.*,

150.    Plaintiff repeats and incorporate by reference the preceding paragraphs.

151.    Ark. Code § 4-88-107(a)(10) prohibits, *inter alia*, deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Arkansas.

152.   Moreover, Ark. Code §§ 4-88-108(a)(1)-(2) prohibits, *inter alia*, the act, use or employment of any deception, fraud, false pretense, concealment, suppression, or omission of any material fact with intent that others rely thereon in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of Arkansas.

153.   As a large healthcare provider, Conway conducted business, trade, or commerce in the State of Arkansas.

154.   In the conduct of its business, trade, and commerce, and in furnishing services in the State of Arkansas, Conway's actions were directed at consumers.

155.   In the conduct of its business, trade, and commerce, and in furnishing services in the State of Arkansas, Conway collected and stored highly personal and private information, including PII belonging to Plaintiff and the members of the Class.

156.   In the conduct of its business, trade, and commerce, and in furnishing services in State of Arkansas, Conway engaged in deceptive, unfair, and unlawful trade acts or practices, in violation of Ark. Code § 4-88-107(a)(10), including but not limited to the following:

   a.   Conway misrepresented and fraudulently advertised material facts, pertaining to the sale and/or furnishing of healthcare services to the Class by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard Class Members' PII from unauthorized

disclosure, release, data breaches, and cyber-attack, and moreover, that its business associates would do the same;

b.  Conway misrepresented material facts pertaining to the sale and/or furnishing of medical services to the Class by representing and advertising that it did and would comply with the requirements of relevant federal and state laws pertaining to privacy and security of Class Members' PII and that its business associates would do the same;

c.  Conway omitted, suppressed, and concealed the material fact of the inadequacy of its privacy and security protections for Class Members' PII;

d.  Conway engaged in deceptive, unfair, and unlawful trade acts or practices by failing to maintain the privacy and security of Class Members' PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45) and HIPAA (42 U.S.C. §§ 1302d *et. seq.*);

e.  Conway engaged in deceptive, unfair, and unlawful trade acts or practices by failing to disclose the Data Breach to Class Members in a prompt and accurate manner, contrary to the duties imposed by Ark. Code §§ 4-110-101, *et seq.*;

        f.      Conway engaged in deceptive, unfair, and unlawful trade acts or practices by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Class Members' PII from further unauthorized disclosure, release, data breaches, and theft;

157. Conway systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of Plaintiff and members of the Class;

158. Conway willfully engaged in such acts and practices, and knew that it violated §§ 4-88-101, *et seq.*, or showed reckless disregard for whether it violated §§ 4-88-101, *et seq.*

159. As a direct and proximate result of Conway's deceptive trade practices, Class Members suffered injury and/or damages, including the loss of their legally protected interest in the confidentiality and privacy of their PII and the loss of the benefit of their respective bargains.

160. The above unfair and deceptive practices and acts by Conway were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

161. Conway knew or should have known that its computer systems and data security practices were inadequate to safeguard Class Members' PII and that risk of a data breach or cyberattack was highly likely. Conway's actions in engaging in the

above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Class.

162.    Plaintiff and Class Members seek relief under Ark. Code §§ 4-88-103(f)(1)(A), (3), including, but not limited to, actual damages, injunctive relief, and/or attorney's fees and costs.

163.    Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**

164.    Plaintiff repeats and incorporates by reference the preceding paragraphs.

165.    In the alternative to the claims alleged above, Plaintiff alleges that she has no adequate remedy at law and brings this unjust enrichment claim on behalf of the Class Members.

166.    Plaintiff and Class Members conferred a monetary benefit on Conway in the form of payment for healthcare services. Plaintiff and Class Members also provided their PII to Conway.

167.    The money that Plaintiff and Class Members paid, directly or indirectly, to Conway should have been used by it, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

168.    As a result of Conway's conduct described herein, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between healthcare services associated with the reasonable data privacy and security

practices and procedures that Plaintiff and Class Members paid for, and the inadequate healthcare services without reasonable data privacy and security practices and procedures that they received.

169.   Under principles of equity and good conscience, Conway should not be permitted to retain money belonging to Plaintiff and Class Members because Conway failed to use that money to implement the reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal and state law, and industry standards and best practices.

170.   Conway should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by Conway.

171.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Conway traceable to Plaintiff and Class Members.

172.   Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

## EIGHTH CLAIM FOR RELIEF
### CONVERSION

173.   Plaintiff repeats and incorporates by reference the preceding paragraphs.

174.   At all times relevant hereto, Plaintiff and Class Members had ownership rights to their PII.

175.    Conway engaged in the wrongful act of disposing of the PII by giving cyber criminals access to it.

176.    As explained at length above, Plaintiff and the Class were damaged thereby.

177.    Plaintiff has sustained damages in excess of the jurisdictional threshold of this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of herself and all others similarly situated, requests the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiff as Class representative and her counsel as Class counsel;

B.    A mandatory injunction directing Conway to safeguard the PII of Plaintiff and the Class hereinafter adequately by implementing improved security procedures and measures;

C.    A mandatory injunction requiring that Conway provide notice to each member of the Class relating to the full nature and extent of the Data Disclosure and the disclosure of PII to unauthorized persons;

D.    An award of damages, in an amount to be determined;

E.    An award of attorneys' fees and costs;

F.    An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law; and

G.    Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to ARCP 38(a), Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 15, 2020

Respectfully submitted,

Christopher D. Jennings
AR Bar No. 2006306
JOHNSON FIRM
610 President Clinton Avenue, Suite 300
Little Rock, AR 72201
Tel: (501) 372-1300
chris@yourattorney.com

Lynn A. Toops*
Lisa M. La Fornara*
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

J. Gerard Stranch, IV*
Peter J. Jannace*
BRANSTETTER, STRANCH
& JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gerards@bsjfirm.com
peterj@bsjfirm.com

* To seek admission *pro hac vice*

*Counsel for the Plaintiff and the Proposed Class*

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## 20TH CIRCUIT DIVISION 1

<u>DANIELLE MARSHALL V CONWAY REGIONAL MEDICAL CENTER</u>

23CV-20-771

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

CONWAY REGIONAL MEDICAL CENTER, INC.
AKA CONWAY REGIONAL HEALTH SYSTEM
2302 College Avenue
Conway, AR  72034

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Chris Jennings
610 President Clinton Avenue
Suite 300
Little Rock, AR  72201

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034

J Wiggs, DC

Date: 07/16/2020

**NOTICE OF RIGHT TO CONSENT**
**TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE**

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 07/16/2020

No. 23CV-20-771 This summons is for CONWAY REGIONAL MEDICAL CENTER, INC. (name of Defendant).

PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:
_____

❑ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____        SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____        By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2020-Jul-15  16:42:13
23CV-20-771
C20D01 : 4 Pages

# UNIFORM COVER PAGE

[To be used when required by Administrative Order No. 2 (g)*]

COURT:    **CIRCUIT**    COURT OF **FAULKNER** COUNTY

Docket/Case Number: _____

CASE NAME:
PLAINTIFF/
PETITIONER:    **DANIELLE  MARSHALL**

DEFENDANT/
RESPONDENT:    **CONWAY REGIONAL MEDICAL CENTER, INC**

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):    **EXHIBIT A**

*Administrative Order No 2.
　　(g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).
　　(2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.

# EXHIBIT A



**CONWAY REGIONAL**
**H E A L T H   S Y S T E M**

Return Mail Processing Center
P.O. Box 6336
Portland, OR 97228-6336

DANIELLE MARSHALL

Dear Danielle Marshall:

We are writing to inform you of a data security incident that may have impacted your personal information. This letter contains information about what occurred and services we are making available to you to protect your information.

On June 26, 2019, we discovered that some of your personal information may have been accessed by an unknown, unauthorized third party due to an email phishing attack. After identifying unusual activity surrounding employees' email accounts, we immediately investigated to determine whether information in the accounts was at risk. The investigation determined that an intruder gained access to the employees' accounts and could have viewed documents that contained your name, address, physician name, medications, Medicare ID number, Social Security number, and insurance information. Our investigation did not identify any specific access of your information and we are not aware of your information being used in an unauthorized manner. However, we are sending you this letter to provide you with resources to protect your personal information.

Because we value you and the safety of your information, we have arranged for you to enroll with Equifax to provide you with **Equifax® Credit Watch™ Gold** services at no cost to you. Your 12 month membership includes the following:

- Equifax® credit file monitoring and alerts to key changes to your Equifax credit report
- Wireless alerts (available online only) Data charges may apply.
- Access to your Equifax credit report
- Internet Scanning[1] Monitors suspicious web sites for your Social Security, Passport, Credit Card, Bank, and Insurance Policy Numbers, and alerts you if your private information is found there.
- Automatic Fraud Alerts[2] with a fraud alert, potential lenders are encouraged to take extra steps to verify your ID before extending credit
- Up to $25,000 Identity Theft Insurance[3]
- Live agent Customer Service 7 days a week from 8 a.m. to 3 a.m.

---

[1] Internet scanning, will scan for your Social Security number (if you choose to), up to 5 bank account numbers, up to 6 credit/debit card numbers you provide, up to 3 email addresses, up to 10 medical ID numbers, and up to 5 passport numbers. Internet scanning scans thousands of Internet sites where consumers' personal information is suspected of being bought and sold, and is constantly adding new sites to those it searches. However, the Internet addresses of these suspected Internet trading sites are not published and frequently change, so there is no guarantee that Internet scanning is able to locate and search every possible Internet site where consumers' personal information is at risk of being traded.

[2] The Automatic Fraud Alert feature made available to consumers by Equifax Information Services LLC and fulfilled on its behalf by Equifax Consumer Services LLC.

[3] Identity theft insurance is underwritten by American Bankers Insurance Company of Florida or its affiliates. The description herein is a summary and intended for informational purposes only and does not include all terms, conditions and exclusions of the policies described. Please refer to the actual policies for terms, conditions and exclusions of coverage. Coverage may not be available in all jurisdictions.

474

To enroll online, please visit http://myservices.equifax.com/efx1_bresngis and follow the below instructions:

1. **Welcome Page:** Enter the below Activation Code and click the "Submit" button.
   Activation Code: **457881451362**
   Enrollment Deadline: **11/30/2019**
2. **Register:** Complete the form with your contact information (name, gender, home address, date of birth, Social Security Number and telephone number) and click the "Continue" button.
3. **Create Account:** Complete the form with your email address, create a User Name and Password, check the box to accept the Terms of Use and click the "Continue" button.
4. **Verify ID:** The system will then ask you up to four security questions to verify your identity. Please answer the questions and click the "Submit Order" button.
5. **Order Confirmation:** This page shows you your completed enrollment. Please click the "View My Product" button to access the product features.

Identity Restoration: If you become a victim of identity theft, an Equifax identity restoration specialist will work on your behalf to help you restore your identity. To be eligible for Identity Restoration, you must complete the enrollment process for the subscription offer by the enrollment deadline above. Call the phone number listed in your online member center for assistance.

Conway Regional Medical Center regrets any inconvenience that this incident may cause you and remains dedicated to protecting your personal information. To minimize the risk of a recurrence of this type of incident, we are reviewing our information security policies and procedures and have required all employees to change their passwords to maintain the security of our information systems. Should you have any questions or concerns about this letter, please contact (855) 964-0517 from 9:00 AM to 9:00 PM ET, Monday through Friday.

Sincerely,

Matthew Troup
President & CEO
Conway Regional Health System

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2020-Jul-15  16:42:13
23CV-20-771
C20D01 : 4 Pages

# UNIFORM COVER PAGE

[To be used when required by Administrative Order No. 2 (g)*]

COURT:    **CIRCUIT**    COURT OF    **FAULKNER**    COUNTY

Docket/Case Number: _____

CASE NAME:
PLAINTIFF/
PETITIONER:        **DANIELLE  MARSHALL**

DEFENDANT/
RESPONDENT:    **CONWAY REGIONAL MEDICAL CENTER, INC**

TITLE OF PLEADING OR
DOCUMENT BEING FILED
(If a multi-part file,
the designation "part _ of _"
(example, part 1 of 2)):        **EXHIBIT B**

*Administrative Order No 2.

(g) *File Mark.* (1) There shall be a two inch (2") top margin on the first page of each document submitted for filing to accommodate the court's file mark. If the pleading or document must be filed in multi-parts because of size or for other reasons, the first page of each part must include the file name and file mark and shall clearly indicate the part number and number of parts (example, part 1 of 2).

(2) If a document is such that the first page cannot be drafted to provide sufficient space to satisfy the file-mark requirement, the document must include the uniform cover page developed by the Administrative Office of the Courts and found under Forms and Publications at www.arcourts.gov.

# EXHIBIT B

# Notice of Privacy Practices

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION.**

*PLEASE REVIEW THE INFORMATION IN THIS NOTICE CAREFULLY.*

This notice provides you with information to protect the privacy of your confidential health care information, hereafter referred to as protected health information (PHI). The notice also describes the privacy rights you have and how you can exercise those rights. This notice serves as a joint notice from Conway Regional Health System and members of the Conway Regional Health System medical staff through an organized health care arrangement.

The law requires that we have privacy protections for PHI and to give you Notice of our legal responsibilities to individuals. We are required to follow the terms and conditions contained in this Notice of Privacy Practices, but we reserve the right to change the privacy practices described in it. A current version of this Notice is posted on our website and in prominent areas of our facilities. We are also required to notify you if a breach of your health information occurs.

**Uses and Disclosures of Your Health Care Information**

**Treatment Purposes**: Your PHI may be used by and disclosed to other health care professionals for the purpose of providing you with health care services. This may also include the need for us to obtain PHI from your current or previous health care providers. For example, information obtained by a nurse, physician or other member of your healthcare team will be recorded in your medical record and used to determine the course of treatment that should work best for you.

**Payment Purposes**: Your PHI may be used by and provided to your health plan or insurance provider for the purpose of receiving payment for health care services. Your insurer also has a right to access your health care information for payment determinations or for conducting quality activities. PHI may also be disclosed to comply with workers compensation laws and similar programs. Your PHI may be shared with other healthcare providers, if necessary, for payment purposes.

**Health Care Operations**: Your PHI may be used or disclosed for health care operations. Our staff members and independent contractors may be required to access PHI for certain business operations and for quality improvement purposes. These uses and disclosures are necessary to operate Conway Regional Health System to help ensure that all of our patients receive quality care. For example, we may use PHI about your health care condition to evaluate the performance of our staff in caring for you.

**Business Associates**: There are some services in our organization that are provided through contract with business associates and subcontractors of Business Associates. Your health care information may be used by or disclosed to our business associate(s) to provide and bill for services. These business associates will sign an agreement that requires them to have procedures in place to protect the privacy of your PHI. Business Associates are also required to be compliant with the HIPAA regulations.

**Patient Directory**: Your PHI will be used to maintain a listing of the names, locations, general condition and religious affiliation of patients in our facilities. The information may be disclosed to members of the clergy and to others who specifically request the information by identifying the patient by name. You may inform our Admission staff or a caregiver if you choose to object to this use or disclosure.

**Notification of and Communication with family**: Your PHI may be used or disclosed to notify or assist in notifying a family member, personal representative or another person responsible for your care, of your location and general condition. Health professionals, using their judgment, may disclose to a family member or any other person you identify, health information relevant to that person's involvement in your care or payment related to your care.

**Fundraising**: We may contact you as part of a fundraising effort for the hospital. In addition to utilizing contact information such as your name, address and telephone number and potentially the date(s) you received services from our organization, we may use and or disclose the department of service, treating physician, outcome information, and health insurance information. If you do not want to be contacted for fundraising efforts, you may opt out of receiving these communications. Please contact either the Marketing Department or the Privacy Officer.

**Contacts**: We may contact you to provide appointment reminders or to tell you about new treatments or services.

**As Required by Law**: Your PHI will be used or disclosed when we are legally required to do so. If this occurs, we will limit the PHI used or disclosed to the minimum necessary to comply with the law.

**Inmates**: If you are an inmate, your PHI may be used or disclosed to the correctional institution or agents thereof when necessary for your health and the health and safety of others.

**Emergencies**: Your PHI may be used or disclosed in an emergency treatment situation. Your acknowledgement will be obtained as soon as practicable following the emergency.

**Workers' Compensation**: We may disclose PHI to file workers' compensation claims.

**To avert a serious threat to health or safety**: We may use and disclose PHI about you when necessary to prevent a serious threat to your health and safety or the health and safety of the public or another person.

**Organ Procurement Organizations**: Consistent with applicable law, we may disclose PHI to organ procurement organizations for the purpose of organ and tissue donation and transplant.

**Military:** If you are or have been a member of the armed forces, we may release PHI about you as required by military command authorities.

**Research:** We may disclose PHI about you for research purposes when the research has been approved by an institutional review board and privacy protocols have been established. Your research-related treatment may be conditioned on signing an authorization to use and disclose your PHI in the research. You may also be asked to sign an authorization that would allow your PHI to be used in future research studies.

**Public Health Authorities:** As required by law, we may disclose your PHI to the public health or legal authorities charged with preventing or controlling disease, injury or disability. For example, reporting births and deaths, reporting suspected abuse or neglect; and, reporting communicable disease information as required by public health authorities.

**Health Oversight Activities:** We may disclose PHI to a health oversight agency for activities authorized by law, including, for example, audits, investigations, inspections, medical device reporting and licensure.

**Legal Proceedings:** We may disclose your PHI in the course of any judicial or administrative proceeding or in response to a court order, subpoena, discovery request or other lawful process, as allowed by law.

**Law Enforcement Officials:** We may release PHI for law enforcement purposes as required by law such as to identify or locate a suspect, fugitive, material witness, or missing person; about the victim of a crime if, under certain circumstances, we are unable to obtain the person's agreement; about a death we believe may be the result of criminal conduct; about criminal conduct at or during services being provided by Conway Regional Health Systems; and, in emergency circumstances to report a crime, the location of the crime or victim(s), or the identity, description or location of the person who committed the crime.

**Coroners, Medical Examiners and Funeral Directors:** We may disclose PHI to coroners, medical examiners or funeral directors consistent with applicable law to allow these individuals to carry out their duties.

**National Security and Intelligence Activities:** We may release PHI about you to authorized federal officials for intelligence, counterintelligence, and other national security activities authorized by law.

**Sale of Information:** Conway Regional Health System will not sell your information without your prior authorization or as otherwise allowed by law.

**Required Uses and Disclosures:** Conway Regional Health System must make disclosures when required by the Secretary of the Department of Health and Human Services to investigate or determine our compliance with the HIPAA Privacy Regulations.

Your PHI may be used or disclosed for other purposes not identified above based on your signing a specific authorization form. You can revoke this authorization at any time provided you submit the revocation in writing to the Conway Regional Health System Privacy Officer. However, Conway Regional Health System is unable to "take back" any uses or disclosures that were made pursuant to the authorization prior to its revocation.

**Your Health Information Rights**

**Right to Request a Restriction of Uses and Disclosures:** You have the right to request in writing a restriction on certain uses and disclosures of your PHI. We are not required to agree to the requested restrictions, unless you are requesting to restrict certain information from your health plan and you have paid Conway Regional Health System for those services in full *prior* to receiving those services.

**Right to Request Confidential Communications:** You have the right to request that we communicate with you about your PHI in a certain way or at a certain location to protect the confidentiality of the information.

**Right to Inspect and Copy:** You have the right to request to inspect or obtain a copy of your PHI in paper or electronic form. There are a few exceptions to this right such as psychotherapy notes. For copies of your PHI, we may charge a reasonable fee for copying, postage (if mailed) and other costs associated with your request.

**Right to Amend:** You have the right to request that we amend your PHI that we created if you feel that the information is incorrect or incomplete. To request an amendment, you must submit the request in writing to our Privacy Officer. You must also provide reasoning to support your request. In addition, we may deny your request if you ask us to amend information that (1) was not created by us, unless the person or entity that created the information is no longer available to make the amendment; (2) is not part of the information kept by or for us; (3) is not part of the information which you would be permitted to inspect or copy; or (4) is accurate and complete.

**Right to Receive an Accounting of Disclosures:** You have the right to request a record of certain disclosures of your PHI.

**Right to Receive a Paper Copy of this Notice:** You have a right to receive a paper copy of our Notice of Privacy Practices. You may request a copy of this notice from the Admissions desk. The Notice is also posted on our website at www.conwayregional.org.

**Right to File a Complaint:** You have the right to file a complaint if you believe we are not in compliance with our Notice of Privacy Practices and the Healthcare Information Portability and Accountability Act (HIPAA) or if you believe your privacy rights have been violated. Your complaint can be submitted to our Privacy Officer via phone, writing, or in person. We value your opinion and we will not retaliate against you in any manner for filing a complaint. You also have a right to file a complaint with the Secretary of the Department of Health and Human Services.

We are committed to protecting the confidentiality of your medical information. If you have any questions, comments, complaints, or concerns, please contact our Privacy Officer at 2302 College Ave., Conway, AR 72034 or by phone at (501) 450-2132.